THOMPSON, Presiding Judge.
 

 On May 19, 2004, after 29 years of marriage, Gwendolyn Pauline Ryland (“the wife”) filed a complaint against Larry Wade Ryland (“the husband”) seeking a divorce. Three children were born of the parties’ marriage — two daughters and a son. At the time the wife filed her complaint for divorce, the parties’ two daughters had reached the age of majority. The parties’ son reached the age of majority in March 2006, before the entry of the judgment in this action. In her complaint for a divorce, the wife requested, among other things, that the trial court order the husband to pay $500 per month in temporary child support pending the final hearing in the matter. On May 25, 2004, the husband answered the complaint. On June 1, 2004, the trial court ordered the husband to pay $500 per month in temporary child sup
 
 *1225
 
 port. Following a hearing, the parties agreed to raise the amount of temporary-child support paid by the husband to $725 per month; the trial court entered an order on June 30, 2004, adopting the parties’ agreement and ordering the husband to pay $725 per month in temporary child support.
 

 The trial court conducted an ore tenus hearing over the course of five days. After the second day of testimony, the trial court entered an order on September 20, 2005, in which it, among other things, ordered the husband to pay the wife $5,000, ordered the husband to continue to pay $725 per month in child support, and continued the case.
 
 [1]
 
 The final hearing concluded on October 12, 2005, and on October 18, 2007,
 
 [2]
 
 the trial court entered a judgment divorcing the parties, ordering the husband to pay periodic alimony, and fashioning a property division. The husband timely appealed.
 

 When a trial court receives ore tenus evidence, its judgment based on that evidence is entitled to a presumption of correctness on appeal and will not be reversed absent a showing that the trial court exceeded its discretion or that the judgment is so unsupported by the evidence as to be plainly and palpably wrong.
 
 Scholl v. Parsons,
 
 655 So.2d 1060 (Ala.Civ.App.1995). This “presumption of correctness is based in part on the trial court’s unique ability to observe the parties and the witnesses and to evaluate their credibility and demeanor.”
 
 Littleton v. Littleton,
 
 741 So.2d 1083, 1085 (Ala.Civ.App.1999). This court is not permitted to reweigh the evidence on appeal and substitute its judgment for that of the trial court.
 
 Somers v. McCoy, 777
 
 So.2d 141 (Ala.Civ.App.2000).
 

 The lengthy trial transcript and the numerous exhibits admitted into evidence at trial reveal the following pertinent facts. The husband and the wife married on June 7, 1975. At the time of the final hearing, the husband was 58 years old and the wife was 56 years old. The parties’ two daughters and son were ages 26, 24, and 18, respectively. The wife worked full-time after the parties married while the husband pursued a doctorate in education. The wife has a masters degree in business education. After the parties’ second daughter was born, the wife did not return to work. In 1998, the wife returned to work at the Andalusia Chamber of Commerce. At the time of the final hearing, the wife was employed full-time as an office manager at the Andalusia Chamber of Commerce earning $9.25 per hour. The wife stated that her net monthly income is $1,200. The wife testified that she receives no benefits through her employer. The wife testified that she had applied for a teaching position in Covington County and surrounding counties but that she had had no success in finding a teaching position.
 

 The husband testified that he has an “education specialist” degree. In 1990, the husband applied for and received a commercial driver’s license. The husband testified that he is also certified in emergency-management training. In May 2000, the husband retired from a position as an instructor at Lurleen B. Wallace Junior College (“LBW”). At the time of the final hearing, the husband received $2,743.55 in
 
 *1226
 
 gross monthly retirement benefits. The husband testified that in June 2000 he began driving an 18-wheel tractor-trailer to generate income. According to the husband, the income he earned as a commercial truck driver varied each month. The husband estimated that he earned an average of $8,000 per month in gross income as a commercial truck driver but that he had to deduct his monthly work expenses (e.g., food and truck maintenance) from that amount. According to the husband, he earned gross income of $96,000, at most, one year as a commercial truck driver. The husband stated that, once his expenses were subtracted from that amount, he earned a net yearly income of only $26,000. The husband testified that in March 2004 he stopped driving the 18-wheel tractor-trailer for medical reasons and that he had not been able to resume driving commercially since that time. The husband later admitted on cross-examination that he had driven the 18-wheel tractor-trailer several months before the final hearing, even though it physically hurt him to do so. The husband testified that he was not employed at the time of the final hearing.
 

 The wife testified that she has no retirement accounts of her own and that she receives no retirement benefits from her current employer. The husband testified that he had a severance plan through his former employer, LBW, valued at $84,707.21. The husband stated that he would not have access to his severance plan, without penalty, until he reached the age of 59’A years.
 

 The husband testified that he believed that he was disabled; he had not applied for disability benefits at the time of the final hearing. The husband testified that he had been diagnosed with diabetes in 1990, that he had suffered from fibromyal-gia for the past 15 years, and that he had suffered from depression for the last 25 years. The husband testified that he also suffered from arthritis and had bone spurs in his heels. The husband stated that he had undergone surgery on his shoulders twice and that he intended to have back surgery in the near future. The record does not reveal the nature of the husband’s back problems.
 

 Over the course of the parties’ marriage, the husband and the wife either purchased or inherited several pieces of real property. In or about 1987, the parties purchased a house on Faulkenberry Street in Andalusia (hereinafter “the Faulkenberry property”). The wife testified that she and the husband had purchased the property for $13,000. According to the wife, the property had been appraised to be worth $26,400. The husband estimated that the Faulkenberry property was worth $49,000.
 

 Also, in 1987, the husband inherited a 22-acre pecan orchard in Conecuh County (hereinafter “the farm”) from his parents. The wife testified that the farm had a tax appraised value of $20,380. However, the wife explained that she believed that the farm was more valuable, given the money that could be earned from the pecans, and estimated that the farm was worth $40,000. The husband estimated the value of the farm to be $30,000. The husband admitted that the farm, on occasion, generates income, but he testified that the farm had generated less income in the last two years because of hurricane damage to the pecan trees. The record does not indicate the specific amount of income generated from the production of pecans on the farm.
 

 The wife testified that, during the parties’ marriage, the Faulkenberry property had fallen into disrepair. According to the wife, the property had sustained substantial damage following Hurricane Opal in 1995. The wife testified that the husband
 
 *1227
 
 had declined to use $6,000 in insurance proceeds to make the necessary repairs to the Faulkenberry property but that he instead had chosen to use the money towards improvements on the farm. The wife testified that she had applied for, and received, a loan in the amount of $6,731 to make the necessary repairs to the Faulk-enberry property. At the time of the final hearing, the wife continued to make monthly payments on the balance of that loan. The wife estimated that she owed $4,000 on the loan at the time of the final hearing. The wife testified that she also had used, at the behest of her oldest daughter, an income-tax refund check in 2000 in the amount of $1,200 to make necessary repairs to the Faulkenberry property. The record indicates that the money was used to paint the interior of the house, to repair the floors, and to replace the stove.
 

 The wife testified at length regarding the husband’s expenditures for the farm and the investments he had made for the benefit of the farm. According to the wife, after the husband inherited the farm, he made improvements that included adding an irrigation system and pump houses, building two ponds, and planting additional pecan trees. The wife estimated that the husband also had purchased in excess of $50,000 worth of equipment to use on the farm. The husband estimated that he had spent $50,000 on the farm over approximately 15 years. The wife testified that she and the children had worked on the farm almost every weekend. The wife testified that the parties had used money from their joint checking account to fund operations on the farm and that the parties’ income-tax refund checks had been deposited in the farm bank account. According to the wife, the husband had assured her throughout the marriage that the farm was their “retirement” and was their “future.” The husband denied telling the wife that the farm was part of her retirement.
 

 In addition to the Faulkenberry property and the farm, in December 1996 the husband also purchased property from Sara Owens (hereinafter “the Owens property”) that was located near the farm. The wife testified that the Owens property consists of approximately 60 acres of land, and, the record indicates, it has two houses on it. The husband lived in one of the houses at the time of the final hearing, and the other house remained vacant. The record does not indicate the value of the Owens property.
 

 The wife testified that in 1982 she and the husband had purchased property in Monroe County consisting of five acres of land with a house on the land (hereinafter “the Monroe County property”) for $10,000. The wife testified that she and the husband had rented the Monroe County property and had used the rental income that was deposited into a joint bank account to make any necessary repairs to the property, as well as to pay for some of the children’s expenses. The wife testified that the Monroe County property had not generated any rental income since 2001. The wife stated that she had closed the rental bank account, which at the time it was closed had a balance of $1,500, and that she had placed that money in her personal checking account.
 

 According to the wife, the house on the Monroe County property burned in February 2004. The wife testified that the house had been insured for $10,000 with State Farm Insurance Company at the time. According to the wife, the husband had declined to sign a release at the time of the final hearing, so State Farm had not yet paid the money owed under the policy. The wife estimated that the Monroe County property was worth $8,000 to $5,000
 
 *1228
 
 after the house on the property had sustained damage from the fire.
 

 The husband testified that he and the wife had purchased the Monroe County property for $16,000. The husband testified that he and the wife had made improvements to the property and began to rent the property to others in 1983. The husband testified that the wife had received all the rental income from the Monroe County property. The husband estimated that the wife had received $3,600 per year in rental income from the property. The husband admitted that he had refused to sign the release for the insurance funds needed to repair the house on the Monroe County property.
 

 Over the course of the parties’ marriage, the husband had purchased approximately 20 pieces of property at tax sales in Cov-ington County and Conecuh County. The husband’s testimony reveals that the cumulative appraised value of the property he had purchased totaled $142,470. The husband testified that the property he had purchased at tax sales included a house valued at $50,000. The husband explained that a “trespasser” was living in the house at the time of the final hearing and that, therefore, he was unable to rent the house. The husband testified that he had initiated legal proceedings against the trespasser but had had no success.
 

 In 1990, the wife’s parents deeded to the wife a one-third interest in certain real property located in Monroe County. The wife testified that she had not considered the property to be hers at the time her parents deeded a one-third interest in the property to her because her parents were still living at the time and continued to use the property. The husband estimated the fair market value of that property to be $60,000. The record does not indicate if the husband was referring to the total value of the property or the value of the wife’s interest in the property.
 

 At the time of the final heai'ing, the husband and the wife had been living apart for approximately five years. The wife testified that in May 2000 the husband had moved off of the Faulkenberry property and had moved onto the Owens property. The husband lived on the Owens property at the time of the final hearing in this matter. According to the wife, the husband moved out of the Faulkenberry property — a two bedroom house — after she rearranged the living arrangements so that the two children still living in the house could each have their own room, requiring the husband and her to sleep in the living room.
 

 The wife testified that, after the husband had moved to the Owens property, she had continued to visit the husband on the weekends. The wife stated that she had worked at the farm on the weekends, cooking, cleaning, and washing clothes. The wife testified that she had last visited the farm in March 2003; according to the wife, at that time she had found evidence indicating that the husband was having an affair. The wife testified that the husband had never inquired as to why she had not returned to the farm after March 2003.
 

 The wife testified that in early November 2003 the husband had asked her to sign a deed divesting her of any interest in the Owens property. According to the wife, the husband had explained that he intended to convey the property to the parties’ son. The wife testified that she had signed the deed on that basis. The wife testified that the husband also had asked her to sign a deed transferring ownership of the Monroe County property but that she had refused to do so. According to the wife, approximately two weeks later, on November 24, 2003, the husband asked her for a divorce.
 

 
 *1229
 
 The wife testified at length regarding her monthly expenses. The wife estimated that her monthly living expenses were $1,567. Included in that amount, among other things, was $140 for electricity, $125 for gas for her vehicle, $154 for the son’s car insurance, $55 a month for her car insurance, $33 a month for home telephone service, $35 a month for cellular-telephone service, $155 towards the payment of a loan for home repairs, and $200 in miscellaneous expenses. The wife testified that her brother typically gives her $30 to $40 a week to help her buy groceries. The wife explained that she used a credit card to pay for monthly expenses that her employment income would not cover. She testified that she owed approximately $400 on a gas credit card. The wife further testified that she owed the parties’ oldest child $5,000 that she had borrowed to pay her attorney fees and that she intended to reimburse the oldest child for the money loaned for the attorney fees.
 

 The wife testified that the husband owed a child-support arrearage in the amount of $9,425. According to the wife, since the trial court entered its June 2004 child-support order, the husband has paid $240 for the son’s high-school graduation materials and $465 in uncovered medical expenses for the son. The wife testified that the husband had purchased the son a 1994 Toyota pickup truck for $1,900 during the period that he was not paying child support for the son. The wife estimated the value of the Toyota truck to be $4,000. The wife testified that the truck was the second vehicle the husband had purchased for the parties’ son. The wife explained that the husband had also purchased a 2001 Pontiac Firebird for the parties’ son. The wife did not testify regarding the value of the 2001 Pontiac vehicle. The wife testified that she drives a 1996 Honda Accord that her oldest child gave to her. According to the wife, the vehicle is titled in the oldest child’s name. The wife owns a 1969 Buick Skylark. The husband testified that the Buick is in mint condition and estimated its value to be $10,000.
 

 The wife testified that the husband had numerous guns, a gun vault, and two gun cabinets that she estimated were worth $50,000. The husband explained that the parties’ son had taken the guns and declared them to be his and that, therefore, the guns belonged to the son. The wife testified that the husband also had an extensive collection of Craftsmen brand tools that she estimated were worth $5,000.
 

 The wife testified that the parties’ son attends community college at LBW and lives with her. According to the wife, at the time of the final hearing the son was a freshman and was working toward a degree in business administration. The wife explained that the son wanted to attend LBW for two years before transferring to another college. The wife testified that the son intends to continue to live with her until he completes his courses at LBW. The wife testified that the son’s grades consisted of B’s and a couple of C’s. According to the wife, the son receives a small band scholarship and is not receiving student loans. The wife testified that the husband has paid for the son’s tuition, books, and supplies.
 

 The record contains extensive testimony regarding the husband’s sale of the parties’ marital assets, including real property and equipment, after the wife initiated divorce proceedings. The husband testified that he had not deeded, as he had told the wife he would, the Owens property to the parties’ son. The husband explained that he had sold the Owens property to Joseph Hornady on December 23, 2003, one month after he had asked the wife for a divorce. The husband testified that Hornady had paid $10 and “other valuable consider
 
 *1230
 
 ation” for the Owens property. The husband explained that the other consideration for the Sara property included the reservation of hunting and fishing rights for the husband and permission for the husband to continue to reside in one of the houses on the Owens property until his death. According to the husband, the sale of the Owens property to Hornady also had relieved him of $60,000 in mortgage indebtedness on that property. The husband estimated that the Owens property had been worth $140,000 at the time he had purchased the property in December 1996. The husband denied that an agreement with Hornady existed that provided for Hornady to deed the property back to the husband once the parties’ divorce was final. The husband testified, however, that after the sale he had continued to pay insurance premiums on the two houses on the Owens property, had maintained the property by paying $8,400 to replace the roof on one of the houses, and had paid for the utilities and other expenses. The record indicates that the husband also had paid the monthly mortgage on the Owens property on at least two occasions after he had sold the Owens property to Hornady.
 

 In addition to the Owens property, the husband sold farming equipment that included three tractors, a “bushhog,” a trailer, pecan-harvesting equipment, a sprayer, and a backhoe to Francis Windham, whom the husband described as a “real good friend,” for $10. The husband testified that Windham was one of his neighbors. According to the husband, Windham let him store the equipment under a shed on the farm and continue to use the equipment. The husband denied having an agreement with Windham to purchase the tractors back after the divorce is finalized. The husband testified that if the three tractors he sold were purchased by someone other than his friend, they would probably sell collectively for $20,000 to $25,000.
 

 In or about 1999, the husband purchased a 1995 International brand 18-wheel tractor-trailer for $21,000. The husband estimated the value of the tractor-trailer to be $6,000 at the time of the final hearing. In 2003, the husband sold the tractor-trailer to Nathan Robinson for $100. The husband testified that he leased the tractor-trailer from Robinson after selling it and that he continued to pay the insurance premiums on the tractor-trailer. The husband explained that he also spent $20,590.26 to make necessary repairs to the tractor-trailer after he had sold it to Robinson.
 

 Income-tax returns for the parties for the tax years 1998, 1999, 2000, 2001, and 2002, were admitted into evidence. The tax returns .contain a depreciation schedule that estimated the value of the farm equipment to be $159,000 in 1998, $167,103 in 1999, $134,040 in 2000, $151,660 in 2001, and $139,164 in 2002. The 2000 income-tax return also included a separate depreciation schedule for the tractor trailer and listed its value at $27,847.
 

 The husband testified that he also had sold a travel trailer in the summer of 2003 to Pat Hennigan for $10. The husband testified that after he had sold the trailer he had continued to pay rent for a lot to park the trailer. The husband explained that the trailer was being stored at Wind-ham’s house for Hennigan to pick up.
 

 The husband testified that he has several life-insurance policies, a couple of annuities, and a deductible-employee-contribution account with the Retirement Systems of Alabama (“the RSA”). The husband’s testimony revealed that he had withdrawn substantial sums from his annuities and the RSA account and had borrowed substantial sums against his life-insurance policies after the wife filed her complaint for divorce. On December 19, 2003, the hus
 
 *1231
 
 band withdrew $17,551.87 from his AIG Valic account. A September 27, 2005, AIG Valic statement shows a balance in that account of $23,236.84. The husband borrowed $39,746.26 from his Merrill Lynch life-insurance policy on December 22, 2003. He also borrowed $14,713 from his Zurich Kemper account on January 6, 2004, and he withdrew $8,300.63 from his RSA account on December 23, 2003. The husband testified that he also has an account with Nationwide Western Life Insurance Company valued at $14,384.24.
 

 The husband testified that he considered the amounts that he had withdrawn to be loans, and, at the time of the final hearing, he was making quarterly payments to replenish the moneys he had borrowed from the accounts. The husband acknowledged that he was not required to repay the moneys he had withdrawn from those accounts.
 

 The husband was questioned extensively regarding how he had used the money he had withdrawn from his annuities and life-insurance policies. The husband testified that he had spent $4,590 for a prepaid burial policy and $8,000 on a grave marker. The wife submitted copies of numerous checks that the husband had written to “cash.” The wife submitted copies of six checks written to “cash” in the amount of $8,000 each. On most of the checks submitted into evidence, the husband had labeled the check as a “gift.” The husband testified that, at one point, he had withdrawn $14,000 in cash “put it in [his] pocket” and “went out and had a good time” because he “thought [he] deserved it.” The husband testified that he could not recall how he had spent the money, but testified that the money was gone. When asked if he believed it was okay to give money away to prevent the wife from having any part of it, the husband responded “I guess so.”
 

 The husband testified that his monthly expenses included $1,889.53 in payments on loans taken against his life-insurance policies and annuities, approximately $200 per month for gas for his vehicles, $107 in auto insurance, approximately $361.94 in health-related expenses, $55 for his cellular-telephone bill, $75 a month for his home telephone service, $163 for his credit-card bill, $70.50 per month for homeowner’s insurance, and $94 a month for miscellaneous personal expenses. In addition to those monthly expenses, the husband also included expenses associated with the farm equipment that he no longer owned. The husband testified that he paid $170 per month to Farm Plan, a credit account used to cover repairs made on farm equipment; $34 a month for replacement parts for farm equipment; approximately $105 for welding repairs to the farm equipment; and $62.30 per month for welding supplies.
 

 The husband testified that he owns several vehicles. The husband owns a 1974 Chevrolet pickup truck that was inoperable at the time of the final hearing. The husband testified that the 1974 truck was worth nothing. The husband testified that he also owns a 1978 Chevrolet truck that he values at $100, a 1984 Chevrolet Impala that he values at $100, a 1986 Toyota pickup truck worth approximately $400, and a 1991 Chevrolet Suburban that he believed to be worth $1,000. The husband testified that he primarily drives a 1993 Dodge Caravan that he valued at $1,500. According to the husband, no indebtedness remained on the vehicles.
 

 Kimberly Ryland, the parties’ oldest child, testified that she had encouraged the mother to use the 2000 income-tax refund to pay for necessary repairs to the Faulk-enberry property. According to Kimberly, the father did not use his money to support the family. Kimberly explained that
 
 *1232
 
 she had helped pay several household bills while working and living at the Faulken-berry property. Kimberly testified that the family’s money went to paying for the upkeep of the farm. Kimberly testified that the family worked on the farm every weekend.
 

 The husband presented testimony from several witnesses who testified that the wife and the children did not work on the farm every weekend. Patricia Windham, one of the husband’s neighbors, testified the children did not work on the farm every weekend and that she rarely observed the wife at the farm for more than one hour. Similarly, Daniel Padgett, the husband’s nephew, testified that the children and the wife did not spend every weekend working at the farm.
 

 In its October 18, 2007, judgment, the trial court made the following findings of fact:
 

 “The court finds that the parties were married for over 30 years, with three children, two of which were adults at the time of the hearing, and one a minor (who is now over the age of 19, as well); that the family was supported primarily by the husband, who worked outside the home, while the wife was the homemaker, who worked outside the home very little. Throughout the marriage, the husband systematically entered into investments or purchases of property, both real and personal, at the sacrifice of using the same funds to support his family in a more comfortable fashion. In the instance of the Conecuh County property deeded by the husband’s parents, the husband encouraged the wife to believe that it was intended as their retirement and marital funds were used to make expensive improvements, such as building a lake and/or improving a lake, adding an irrigation system, tree planting and the like. The husband led the wife to believe that since this property was intended to fund their retirement, the sacrifice of time, money and energy spent on the Conecuh County property, rather than the family and the family home, was justified. The husband also invested in various brokerage accounts in his name alone consistently during the marriage. While building an estate is admirable, in this instance it was done at the sacrifice of the family’s comfort, while they continued to live in a small, crowded, ill furnished home. The court finds that the wife and the two older daughters occasionally used deceitful tactics to make small improvements to the marital home and to their comfort; necessitated by the husband’s insistence on building a retirement estate.
 

 “The court further finds that the property in Monroe County in which the wife was deeded a one third interest, along with her brother and sister, is true inherited property and is not a marital asset. As the husband and the wife both testified, neither knew of the existence of the deed until the divorce hearing; the property was in no way co-mingled or used by the parties during the course of the marriage, unlike the Conecuh County property deeded to the couple by the husband’s parents, which the Court finds to be marital property.
 

 “Additionally, the court finds that the husband’s actions in selling various valuable pieces of land, equipment and vehicles were an obvious sham intended to preclude the wife from claiming any interest in them; and that the husband will be able to re-acquire any interest he may have conveyed to Nathan Robinson, Francis Windham, Joseph Hornady and Pat Hennigan by returning the various $10 and $100 considerations paid by them to him in an effort to defraud the wife. The court finds that he, shortly
 
 *1233
 
 after asking for the divorce, cashed in all accounts and insurance policies that he could, in an effort to convert them to cash, which he has attempted to hide from the wife. The unknown checks made payable to himself in cash total over $78,800. In contrast, the wife closed out two accounts, each with approximately $1,500 in them, and opened new bank accounts in her name alone, totaling $3,000.
 

 “The court further finds that the marital separation occurred after the wife suspected the husband of adultery, a claim which he never denied during the trial.
 

 “The court finds that the marital assets total $791,322.72 and that same should be divided equally between the parties.”
 

 Based on those findings, the trial court awarded the wife $395,661.36 of the marital assets. Included in her $395,661.36 portion of marital assets were, among other things, the Faulkenberry house, the Monroe County property, the balance of the AIG Vahe account, the State Farm insurance check in the amount of $10,000, the 1969 Buick Skylark, and $3,000 she had withdrawn from two joint bank accounts. The trial court ordered the husband to pay the wife the remaining balance of her portion of the marital assets in cash. The remaining half of the marital assets were awarded to the husband subject to his executing a mortgage on all the property he owns an interest in, or acquires an interest in, to the wife until all payments due the wife under the divorce judgment are paid in full.
 

 The trial court ordered the husband to pay the wife $5,034.75 as a child-support arrearage. Regarding postminority support, the trial court ordered “[tjhat the husband pay postminority support for his son, Corey, including tuition, books, school supplies, fees, medical and dental expenses, room, board, transportation, and reasonable extra-curricular expenses for four continuous years, exclusive of summers.”
 

 The trial court also ordered the husband to pay the wife $375 per month in periodic alimony for the next four years, or until the son leaves school, and ordered the husband to pay $1,000 in periodic alimony to the wife after the child leaves school, or after October 23, 2009, whichever comes first. The trial court further ordered the husband to pay the wife’s attorney $16,920 as attorney fees.
 

 On appeal, the husband contends that the trial court exceeded its discretion by awarding the wife one-half of the marital assets and periodic alimony.
 
 [3]
 
 Specifically, the husband argues that the trial court disregarded that he had been primarily responsible for the size and value of the marital estate and that the wife had contributed little to the value of the marital estate. The husband further argues, albeit briefly, that the trial court failed to consider his ability to pay when it provided that the wife’s monthly periodic-alimony award be increased by $625 after the parties’ son leaves college or after October 23, 2009, whichever comes first.
 

 The issues of property division and alimony are interrelated, and, therefore, they must be considered together on appeal.
 
 Albertson v. Albertson,
 
 678 So.2d 118, 120 (Ala.Civ.App.1996). When the trial court fashions a property division following the presentation of ore tenus evidence, its judgment is presumed correct on ap
 
 *1234
 
 peal and will not be reversed absent a showing that the trial court exceeded its discretion or that its decision is plainly and palpably wrong.
 
 Roberts v. Roberts,
 
 802 So.2d 230, 235 (Ala.Civ.App.2001);
 
 Parrish v. Parrish,
 
 617 So.2d 1036 (Ala.Civ.App.1993); and
 
 Hall v. Mazzone,
 
 486 So.2d 408 (Ala.1986). A property division is required to be equitable, not equal, and a determination of what is equitable rests within the broad discretion of the trial court.
 
 Parrish v. Parrish,
 
 617 So.2d at 1038. In fashioning a property division and an award of alimony, the trial court must consider factors such as the earning capacities of the parties; their future prospects; their ages, health, and station in life; the length of the parties’ marriage; and the source, value, and type of marital property.
 
 Robinson v. Robinson,
 
 795 So.2d 729 (Ala.Civ.App.2001).
 

 The evidence presented to the trial court revealed that the parties had been married almost 30 years at the time the wife filed a complaint for divorce. At the time of the final hearing, the husband was 58 years old and the wife was 56 years old. Although the husband claimed to be in poor health, evidence presented at the final hearing revealed that the husband continued to drive tractors and work on the farm, as well as occasionally drive an 18-wheel tractor-trailer. The wife’s gross monthly income is approximately $1,480, whereas the husband earns a gross monthly income of $2,743.55. While the wife has no retirement accounts in her name and receives no retirement benefits from her current employer, the husband has access to several retirement accounts, as evidenced by the multiple withdrawals he made from those accounts after the wife filed for divorce. The trial court heard conflicting testimony at trial from which it could have concluded that the husband had represented to the wife that the farm was “her retirement.”
 

 The evidence presented at the final hearing called into question the husband’s conduct leading up to the day the wife filed her divorce complaint and his conduct following the wife’s initiation of divorce proceedings. The trial court heard evidence from which it could have concluded that the husband knew the marriage was in trouble and systematically began removing the wife’s name from assets. The record indicates that the husband, under false pretenses, successfully had the wife deed her interest in the Owens property to him under the belief that the parties’ son would receive the property, and when the wife did not agree to sign the deed to the Monroe County property, the husband informed her that the marriage was over. After the wife filed for divorce, the husband withdrew large sums from his investment accounts and borrowed from the cash value of his life-insurance policies in an effort to decrease the marital estate. The husband could not explain where the money he had withdrawn went; he testified only that he no longer had that money. The husband sold real property and equipment to friends and neighbors for significantly less than the market value of those assets. Although the husband denied having ulterior motives, the record reveals that the husband sold real property and equipment that were considered marital assets for substantially less than what they were worth. The trial court could have concluded, based on the evidence, that the husband intended to retrieve the property after the parties’ divorce was finalized.
 

 Regarding the trial court’s award of periodic alimony, the evidence presented to the trial court revealed that many of the husband’s monthly expenses were questionable. The bulk of the husband’s monthly expenses consisted of the repayment of loans taken by the husband from
 
 *1235
 
 annuities and life-insurance policies in an attempt to prevent the wife from receiving a share of the money in those accounts. The husband acknowledged that he was not required to repay the money he had withdrawn from those accounts. The husband’s monthly expenses also consisted of expenses associated with the maintenance of property and equipment that he had sold. The trial court could have disregarded the husband’s claimed monthly expenses for repaying the loans and the maintenance of property that he purportedly did not own. The trial court could have determined that an increased periodic-alimony obligation would not financially cripple the husband given his reduced monthly expenses.
 

 In its judgment, the trial court made specific findings of fact that are supported by the record on appeal. This court will not reweigh the evidence on appeal.
 
 Somers v. McCoy,
 
 supra. Given the age of the parties; the length of the parties’ marriage; the source, value, and type of marital property; and the conduct of the husband, we cannot say that the trial court exceeded its discretion.
 
 Robinson v. Robinson,
 
 supra.
 

 The husband also contends that the trial court erred when it ordered him to execute mortgages on all the property he owns an interest in, or acquires an interest in, to the wife until all payments due the wife under the divorce judgment are paid in full. The husband contends that this provision of the trial court’s judgment effectively gives the wife total control of the marital estate and that the provision is an “abuse of jurisdiction.” The husband cites two cases for the general proposition that matters of property division and alimony rest within the sound discretion of the trial court. The husband, however, cites no caselaw in support of his contention that the trial court erred by ordering him to execute mortgages to property he currently owns and to property he might acquire in the future to the wife. “ ‘[I]t is neither our duty nor [our] function to perform all of the legal research for an appellant.’ ”
 
 McLemore v. Fleming,
 
 604 So.2d 353, 353 (Ala.1992) (quoting
 
 Gibson v. Nix,
 
 460 So.2d 1346, 1347 (Ala.Civ.App.1984)).
 

 As noted by the husband, it is within the trial court’s discretion to fashion a property division in a divorce judgment. Given the evidence elicited at trial indicating that the husband had sold marital property in an effort to prevent the wife from receiving any of that property and the evidence indicating that the husband had attempted to hide marital property, we cannot say that the trial court exceeded its discretion by requiring the husband to mortgage his properties to the wife until he fulfills his obligations under the divorce judgment.
 

 The husband further contends on appeal that the trial court erred by not conditioning the husband’s postminority-support obligation on the son’s performance in college.
 
 [4]
 
 In its October 18, 2007, divorce judgment, the trial court ordered “[t]hat the husband pay postminority support for his son, Corey, including tuition, books, school supplies, fees, medical and dental expenses, room, board, transportation, and reasonable extra-curricular expenses for four continuous years, exclusive of summers.”
 

 
 *1236
 
 “[T]his court has held that the trial court must set reasonable limitations on the parent’s responsibility for postmi-nority education support, because a failure to do so may impose an undue hardship on the paying parent.
 
 See Manring v. Manring,
 
 744 So.2d 919, 922 (Ala.Civ.App.1999);
 
 Hocutt v. Hocutt,
 
 591 So.2d 881, 882 (Ala.Civ.App.1991);
 
 Kent v. Kent,
 
 587 So.2d 409, 412 (Ala.Civ.App.1991). These limitations include (1) limiting the support to a reasonable period, (2) requiring the child to maintain at least a ‘C’ average, and (3) requiring that the child be enrolled as a full-time student.
 
 Manring v. Manring,
 
 744 So.2d 919, 922 (Ala.Civ.App.1999);
 
 Ullrich v. Ullrich,
 
 736 So.2d 639, 643 (Ala.Civ.App.1999) (quoting
 
 Bahri v. Bahri,
 
 678 So.2d 1179, 1181 (Ala.Civ.App.1996)).”
 

 Penney v. Penney,
 
 785 So.2d 376, 379 (Ala.Civ.App.2000).
 

 The trial court’s October 18, 2007, judgment placed no academic restrictions on the husband’s obligation to pay postmi-nority educational support. We note that the trial court also failed to require the son to be enrolled as a full-time student; however, the husband fails to argue this as a basis for reversal of the trial court’s judgment on appeal, and, therefore, any argument as to this issue is waived.
 
 See Boshell v. Keith,
 
 418 So.2d 89, 92 (Ala.1982) (“When an appellant fails to argue an issue in its brief, that issue is waived.”). Because the trial court failed to place academic restrictions on the husband’s obligation to pay postminority educational support, we must reverse the trial court’s judgment as to this issue and remand the case for the trial court to enter an order consistent with this opinion.
 

 The wife’s request for an attorney fee on appeal is granted in the amount of $2,500.
 

 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
 

 PITTMAN, BRYAN, THOMAS, and MOORE, JJ., concur.
 

 [1]
 

 . We note that custody of the parties' minor son was not an issue in the case; the parties agreed that the son would continue to live with the wife until he reached the age of majority.
 

 [2]
 

 . The record contains no explanation for the delay between the conclusion of the final hearing and the trial court’s entry of the final judgment.
 

 [3]
 

 . The husband does not challenge on appeal the trial court's calculation of the parties’ marital assets.
 

 [4]
 

 . The husband does not argue on appeal that the wife failed to establish the actual costs of the son's postminority college expenses or that paying postminority expenses as ordered by the trial court creates an undue hardship on him. The husband also fails to challenge on appeal whether evidence was presented regarding the son's commitment to pursuing a college education.